**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF GEORGIA**
**MACON DIVISION**

| | | |
|---|---|---|
| **DAVID SHANNON HARRISON and** | : | |
| **COURTNEY GABRIELLE HARRISON,** | : | |
| | : | |
| **Plaintiffs,** | : | |
| | : | **CIVIL ACTION** |
| **v.** | : | **No. 5:16-CV-199 (CAR)** |
| | : | |
| **LEGACY HOUSING, LP, GPLH, LC** | : | |
| **and JOHN DOE CORPORATIONS 1-3,** | : | |
| | : | |
| **Defendants.** | : | |
| | : | |

## ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiff David Shannon Harrison filed this premises liability action seeking damages for injuries he sustained after he fell off of a ladder inside a warehouse owned by Defendant Legacy Housing, LP, GPLH, LC ("Legacy"). His wife, Plaintiff Courtney Gabrielle Harrison, asserts a related loss of consortium claim. Presently before the Court is Legacy's Motion for Summary Judgment. Having carefully considered the parties' arguments, the record, and applicable law, the Court finds no genuine issues of material fact exist as to Plaintiffs' claims. Thus, Legacy's Motion [Doc. 28] is **GRANTED**.

## LEGAL STANDARD

Summary judgment is proper if the movant "shows that there is no genuine issue as to any material fact and the movant is entitled to a judgment as a matter of law."[1] Not

---

[1] Fed.R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986).

all factual disputes render summary judgment inappropriate; only a genuine issue of material fact will defeat a properly supported motion for summary judgment.[2]  This means that summary judgment may be granted if there is insufficient evidence for a reasonable jury to return a verdict for the nonmoving party or, in other words, if reasonable minds could not differ as to the verdict.[3]

On summary judgment, the Court must view the evidence and all justifiable inferences in the light most favorable to the nonmoving party; the Court may not make credibility determinations or weigh the evidence.[4]  The moving party "always bears the initial responsibility of informing the court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact" and that entitle it to a judgment as a matter of law.[5]  If the moving party discharges this burden, the burden then shifts to the nonmoving party to respond by setting forth specific evidence in the record and articulating the precise manner in which that evidence creates a genuine issue of material fact or that the moving party is not entitled to a judgment as a matter of law.[6]  This evidence must consist of

---

[2] *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48 (1986).
[3] *See id.* at 249-52.
[4] *See id.* at 254-55; *Welch v. Celotex Corp.,* 951 F.2d 1235, 1237 (11th Cir. 1992).
[5] *Celotex,* 477 U.S. at 323 (internal quotation marks omitted).
[6] *See* Fed. R. Civ. P. 56(e); *see also Celotex,* 477 U.S. at 324-26.

more than mere conclusory allegations or legal conclusions.[7]

"Where [ ] evidence is circumstantial, a court may grant summary judgment when it concludes that no reasonable jury may infer from the assumed facts the conclusion upon which the non-movant's claim rests."[8] "A court need not permit a case to go to a jury [ ] when the inferences that are drawn from the evidence, and upon which the non-movant relies, are 'implausible.'"[9]

Under Georgia law, "[i]n routine cases of premises of liability, i.e., the negligence of the defendant and the plaintiff, and the plaintiff's lack of ordinary care for personal safety are generally not susceptible of summary adjudication, and summary judgment is granted only when the evidence is plain, palpable, and undisputed."[10] However, proof of a fall on one's premises, without more, does not give rise to liability.[11] There must be some fault on the part of the premises owner.[12]

## FACTUAL BACKGROUND

For purposes of this Motion, the material facts in the light most favorable to Plaintiff, the non-movant, are as follows:

Defendant Legacy Housing, LP ("Legacy") is a mobile-home manufacturing

---

[7] *Avirgan v. Hull*, 932 F.2d 1572, 1577 (11th Cir. 1991).

[8] *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 743 (11th Cir. 1986).

[9] *Id.*

[10] *Food Lion, LLC v. Walker*, 290 Ga. App. 574, 577-78 (2008) (citing *Robinson v. Kroger Co.*, 268 Ga. App. 735, 746 (1997)).

[11] *Christensen v. Overseas Partners Capital, Inc.*, 249 Ga. App. 827 (2001).

[12] *See Tanner v. Larango*, 232 Ga. App. 599 (1998).

business based in Fort Worth, Texas. In September 2015, Legacy purchased property and buildings in Eatonton, Georgia formerly owned by Horton Homes, a mobile-home manufacturing business that shut down in 2015. In addition to manufacturing mobile homes, Horton Homes also operated a molding and laminating division of its company called "Horton Components." The laminating process is a necessary component of manufacturing a mobile home.[13] Howard Sneed was the production manager for Horton Components, and Mark Johnson was a salesman for Horton Components. Both Mr. Sneed and Mr. Johnson lost their jobs when Horton Homes went out of business. Legacy did not acquire Horton's molding and laminating division or its laminating equipment in the purchase of Horton Homes.

After Legacy acquired the deed to Horton Homes' manufacturing facilities in late 2015, Mr. Sneed called Curtis Hodgson, one of Legacy's co-owners, to inquire about Legacy's interest in setting up a molding and laminating division in one of its newly-acquired warehouses in Eatonton. Sneed hoped he and Johnson could continue the laminating work they had done with Horton Homes.[14] Sneed's intent was to start a partnership with Legacy, not to be employed by Legacy.[15] In late December, Sneed and Johnson flew to Texas and met with Mr. Hodgson to discuss a potential business

---

[13] Hodgson Depo., p. 17 [Doc. 28-2]. Hodgson describes the lamination process as follows: "You put a cover on sheetrock and luan and some other forms of building materials that makes it look like wallpaper for sheetrock, or makes it look like word for – for molding. And that cover can be paper or vinyl. And it glues and wraps that cover onto the building materials." *Id.*

[14] Sneed Depo., pp. 17-18 [Doc. 28-3].

[15] *Id.* at p. 19.

arrangement with Legacy. Because Mr. Johnson had opened his own picture frame business, Johnson and Hodgson mutually agreed Johnson would not be a part of the potential business relationship. However, Sneed and Hodgson continued discussions.

At that time, Legacy outsourced the molding and laminating for its mobile homes to third parties. Sneed proposed a business relationship whereby Legacy would provide the working capital and space for Sneed to establish his own laminating company, and Sneed would pay rent for the building and provide laminating materials for Legacy's mobile homes at a discounted price. The parties anticipated Legacy being a major customer of the laminating business but not the only customer. At that time, Sneed and Hodgson were not contemplating the laminating business being a division of Legacy or Sneed being an employee of Legacy.[16] However, it is clear the business proposal anticipated Legacy buying the laminating equipment necessary for Sneed to start the business, and Legacy would benefit by receiving rent and discounted prices.

After their meeting in December, Sneed and Hodgson talked "once every week or so" about the equipment Sneed needed to start the laminating business. In late January 2016, Sneed began visiting the site of the potential laminating plant, a warehouse owned by Legacy known as the "green building." Horton Homes had used the green building to store carpet and electrical supplies on two long rows of shelving racks inside the building. Each shelving unit was approximately twelve feet tall with four levels of

---

[16] Hodgson Depo., p. 34 [Doc. 28-2].

shelves.

On January 20, 2016, Sneed emailed Hodgson about his desire to take down some of the shelving in the green building to get a better view of the space. Sneed wrote, "when do you think I can bring someone in to help me tear down racks, build walls and other miscellaneous stuff that needs to be done[?]"[17] Mr. Hodgson replied, "[w]e can give you a [L]egacy employee any time you need one. Ask [M]ick or [F]rank."[18]

Although Johnson was no longer involved as a potential business partner with Legacy and Sneed in setting up and operating the laminating plant, Johnson continued to monitor the development of the laminating business with Sneed.

Plaintiff David Harrison[19] and Johnson have been best friends for 30 years, and Plaintiff and Sneed knew of each other.[20] Plaintiff had heard "there was talk of [Johnson] and [Sneed] opening a new plant, doing work like they had done at Horton Components – laminate and stuff like that."[21] Plaintiff understood Sneed was partnering with Legacy, and Plaintiff had conversations with Johnson about "getting in on the ground level" of their business because he "knew there was some money to be made."[22]

On Wednesday, January 20th—the same day Sneed emailed Hodgson asking when he could bring someone in to help tear down the shelving units—Plaintiff, who

---

[17] Hodgson Depo., Ex. 7 [Doc. 28-2].
[18] *Id.*
[19] The Court will hereinafter refer to Plaintiff David Harrison as "Plaintiff."
[20] Plaintiff Depo., p. 43 [Doc. 28-5].
[21] Plaintiff Depo., pp. 46-47.
[22] Plaintiff Depo., pp. 49-50.

had earlier been hunting with Johnson, rode with Johnson to the green building to see what Sneed was working on and "to listen and observe."[23] "I think [the business] was all in such an infancy stage [ ] of what [Sneed and Johnson] wanted to do, they were throwing out where to put this [laminating] machinery and where to put that machinery, how to set [the building] up . . . for the laminate molding operation that was being talked about."[24] While Plaintiff was at the warehouse, Sneed discussed taking down the shelving; Sneed "just said [the shelving] needed to be taken down, no plans."[25] Plaintiff and Johnson stayed no more than an hour and then left.[26]

The next evening, Thursday January 21st, Johnson told Plaintiff during a telephone conversation that Sneed had secured a forklift to take down the shelving in the green building. "So somewhere in the conversation between me [Plaintiff] and [Johnson] it was decided to go out there [the next day] to help [Sneed] take down the shelving."[27] Johnson "just asked me [Plaintiff] what I was doing on Friday. I told him I had to take care of some business. He said, well, [Sneed] has got the equipment up there to take the shelving down. Let's go up there and help him out."[28] Plaintiff told Johnson when he "got through doing [some] business, [Plaintiff] would meet up with him and help him out."[29]

---

[23] *Id.* at p. 53.
[24] *Id.* at pp. 55; 59.
[25] *Id.* at p. 65.
[26] *Id.* at p. 60.
[27] *Id.* at p. 66.
[28] *Id.* at p. 67.
[29] *Id.* at p. 69.

Plaintiff made no arrangements with Sneed to help dismantle the shelving.[30]

On Friday, January 22nd, Plaintiff finished his personal business, ate some lunch, and drove to the green building. When he arrived around noon, Johnson and Sneed were already in the building working on dismantling the shelving. Johnson and Sneed "told [Plaintiff] what the game plan was as far as taking the shelving down and what they were doing."[31] The shelving consisted of vertical and horizontal slats. The vertical slats were bolted to the floor at the bottom. To dismantle the units, the men used a hammer to "pop" out the horizontal slats first and then remove the vertical slats. After the horizontal slats were removed, the vertical slats would fall over even though they were still bolted to the ground. Johnson and Sneed showed Plaintiff how to "pop[ ] the locks off of each end [of the shelving unit], hitting it with a hammer, knocking it off."[32] After showing Plaintiff how to remove the shelving, Johnson and Sneed left for about 30 minutes to eat some lunch. Plaintiff remained in the building dismantling the shelves.

After Johnson and Sneed returned to the building from lunch, the three men continued dismantling the shelves for an hour to an hour-and-a-half without incident. After dismantling the shelves that could be reached by hand, Sneed and Johnson used a forklift to dismantle the higher shelves. Because operating the forklift was a two-man operation, Plaintiff did not use the forklift. Instead, Plaintiff saw an industrial ladder

---

[30] *Id.* at p. 70.
[31] *Id.* at p. 73.
[32] *Id.*

with a platform next to the shelving unit and used it to access the higher shelves.[33] No one directed Plaintiff to use the ladder. Indeed, it is undisputed neither Sneed nor Johnson knew the ladder was in the warehouse or had used the ladder. Sneed and Johnson dismantled one end of the shelving unit using the forklift, while Plaintiff dismantled the opposite end of the shelving unit standing on the ladder's platform, working their way toward the middle of the unit.

As they met in the middle taking down the last section of the shelving unit, the vertical slat shifted, "snapped back," and hit the top of the ladder upon which Plaintiff stood causing it to topple over.[34] As the ladder toppled, Plaintiff fell to the floor, and the lower part of the ladder hit Plaintiff's legs, causing serious injuries.

It is undisputed no Legacy employee or owner knew Sneed, Johnson, or Plaintiff was on the premises dismantling shelves on January 22, 2016, when the accident occurred. After the accident occurred, Sneed attempted to reach Hodgson by telephone, but he was unable to reach him. Sneed sent an email to Hodgson informing him of the accident.

Sometime in February 2016, it "was becoming clear" to Hodgson that Legacy would be the dominant customer, if not the only customer, of the laminating plant.[35] Moreover, Legacy realized Sneed "by himself didn't have the ability to cultivate an

---

[33] *Id.* at p. 78.
[34] *Id.* at pp. 94, 95.
[35] Hodgson Depo., p. 48 [Doc. 28-2].

outside customer base."[36] Thus, Legacy decided to own and operate the laminating business as a division of its company and have Sneed manage the business rather than run it as his own business.[37] In March 2016, Legacy hired Sneed as the manager of its laminating division. In July 2016, Legacy hired Johnson as the sales manager. Plaintiff did not apply for any job with Legacy and is not employed by Legacy.

Plaintiffs filed this premises liability suit against Defendant Legacy, and Legacy seeks summary judgment on Plaintiffs' claims.

## DISCUSSION

To establish negligence under Georgia law, Plaintiff must show (1) a legal duty; (2) a breach of this duty; (3) an injury; and (4) a causal connection between the breach and the injury.[38] "The threshold issue in any cause of action for negligence is whether, and to what extent, the defendant owes the plaintiff a duty of care. Whether a duty exists upon which liability can be based is a question of law. In the absence of a legally cognizable duty, there can be no fault or negligence."[39]

As the owner of the warehouse where Plaintiff was injured, Legacy's duty to Plaintiff depends upon Plaintiff's legal status on Legacy's premises as an invitee, licensee, volunteer, or trespasser. Generally, a person is an invitee when "an owner or occupier of

---

[36] *Id.*
[37] *Id.*
[38] *See Martin v. Ledbetter*, 342 Ga. App. 208, 211 (2017) (citation omitted).
[39] *Id.* (internal quotation and citation omitted).

land, by express or implied invitation, induces or leads [him or her] to come upon his premises for any lawful purpose."[40] A landowner is liable to an invitee "for injuries caused by his failure to exercise ordinary care in keeping the premises and approaches safe."[41] In contrast, a licensee is a person who "(1) [i]s neither a customer, a servant, nor a trespasser; (2) [d]oes not stand in any contractual relation with the owner of the premises; and (3) [i]s permitted, expressly or impliedly, to go on the premises merely for his own interest, convenience, or gratification."[42] "The owner of the premises is liable to a licensee only for willful or wanton injury."[43] A "trespasser is one who, though peacefully or by mistake, wrongfully enters upon property owned or occupied by another."[44] An owner "owes no duty to keep the premises safe for a trespasser present without his knowledge, even if the owner or occupier generally knows that it is customary for trespassers to enter his property. Once the trespasser's presence becomes known, the only duty is to refrain from willfully and wantonly injuring him."[45] Finally, a volunteer is one who "voluntarily undertakes to perform service," and an owner "does not owe him any duty, except that which he owes to a trespasser[.]"[46]

---

[40] O.C.G.A. § 51-3-1.
[41] *Id.*
[42] O.C.G.A. § 51-3-2(a).
[43] *Id.*
[44] *Barber v. Steele*, 133 Ga. App. 290, 292 (1972).
[45] *Id.*
[46] *Southern Ry. Co. v. Duke*, 16 Ga. App. 673 (1915).

Defendant Legacy argues Plaintiff was a trespasser, volunteer, or, at best, a licensee on its premises; thus, Legacy only owed him a duty not to willfully or wantonly injure him, and no evidence shows Legacy did so. Plaintiff counters he was an invitee lawfully on Legacy's business premises because Sneed, as Legacy's agent, recruited him to help remove shelving in furtherance of Legacy and Sneed's business together. Thus, Defendant owed Plaintiff a duty to exercise ordinary care in keeping the premises safe, and Sneed's breach of that duty may be imputed to Legacy as Sneed's principal. The Court is unpersuaded by Plaintiff's arguments. As explained below, no employment or agency relationship existed between Sneed and Defendant Legacy when Plaintiff was injured, and even if an agency relationship did exist, Sneed acted outside of the scope of any authority Defendant gave him to enlist Plaintiff's help to remove the shelving. Thus, Plaintiff was at most a licensee on Defendant's premises; as a licensee, Defendant owed Plaintiff a duty not to willfully or wantonly injure him, and no evidence supports a finding Legacy had any such willful or wanton intent. Finally, the Court finds even if Plaintiff was an invitee on Legacy's premises at the invitation of Sneed acting as Legacy's agent, no evidence shows Sneed breached any duty owed to Plaintiff.

Agency Relationship

To determine Plaintiff's legal status, and thus what duties Legacy owed to Plaintiff, the Court must first examine the relationship between Legacy and Plaintiff, which in turn hinges on the relationship between Sneed and Legacy. Plaintiff contends Sneed acted as an

agent in the scope of Legacy's business when he recruited Plaintiff and supervised the removal of the commercial shelving units from Legacy's warehouse. Legacy, however, contends Sneed was working on the property in the scope of his personal business and had no agency relationship with Legacy. Thus, the threshold issue becomes whether sufficient evidence exists to show a genuine issue of material fact that Sneed was an agent of Legacy and not merely engaging in a personal endeavor.

Under Georgia law, an agency relationship can arise in three distinct ways: expressly, by implication, or through subsequent ratification by the principal of the agent's conduct.[47] Where an agency relationship does exist, an agent's knowledge is imputed to the principal pursuant to Georgia law. "The principal shall be bound by all acts of the agent within the scope of his authority[.]"[48] Plaintiffs argue Sneed, as Legacy's actual, apparent, or, at minimum, agent by ratification, orchestrated and supervised the removal of the commercial shelving units in Legacy's warehouse. The evidence, however, fails to support such an assertion.

Actual Agency

To determine whether an actual agency relationship exists, Georgia cases have used two tests: the traditional or "true" test of whether a person is a servant or an independent

---

[47] O.C.G.A. § 10-6-1 ("The relations of principal and agent arises wherever one person, expressly or by implication, authorizes another to act for him or subsequently ratifies the acts of another in his behalf.").

[48] O.C.G.A. § 10-6-51.

contractor and a test using the list of ten factors set forth in the Restatement of Agency.[49] The traditional test examines whether the principal "has the right to direct the time, the manner, the methods, and the means of execution of the work, as contrasted with the right to insisting upon results according to specifications of the contract."[50] The test using the ten factors set forth in the Restatement of Agency examines "(1) the extent of control which, by agreement, the employer may exercise over the details of the work; (2) whether or not the one employed is engaged in a distinct occupation or business; (3) whether or not the work to be performed is usually done under the direction of the employer or by a specialist who needs no supervision; (4) the skill required in the particular occupation; (5) whether the employer supplies the tools and the place of work for the one employed; (6) the length of time for which the person is employed; (7) the method of payment, whether by the time or by the job; (8) whether or not the work to be performed is a part of the regular business of the employer; (9) whether or not the parties believe they are creating an agency relationship; and (10) whether the employer is or is not in business."[51]

Under either test, the evidence fails to support an actual agency relationship between Sneed and Legacy at the time Plaintiff was injured. On January 22, 2016, when the accident occurred, the record is clear Sneed was neither employed by Legacy nor in partnership with Legacy. All evidence shows Sneed and Legacy were in discussions about

---

[49] *Keefe v. Carpet & Upholstery Cleaning by Houndstooth, Inc.*, 213 Ga. App. 439, 440 (1994).
[50] *Id.* (citations omitted).
[51] *Moss v. Central of Ga. R. Co.*, 135 Ga. App. 904, 906 (1975).

a potential partnership with Sneed operating the laminating business and Legacy funding the operation to receive a discount on laminate. The evidence is also clear Sneed sought to dismantle the shelves for his benefit to get a better view of the space for the laminating equipment. Legacy did not control the time, manner, methods, or means of executing the work. Sneed had managed Horton Homes' laminating division for 20 years, and thus had the knowledge and skill to determine how to configure the warehouse space. Legacy had no experience in the laminating business, as it contracted its laminating to third parties. No evidence suggests Legacy had any control over the details of dismantling the shelves or that the work needed to be performed under its supervision. It is undisputed Legacy did not pay Sneed, Johnson, or Plaintiff for the work. Most importantly, it is undisputed Legacy had no knowledge Sneed, Johnson, and Plaintiff were dismantling the shelves on January 22nd.

####### Apparent Agency

In addition, no apparent agency relationship existed between Sneed and Legacy. Absent an express agreement, apparent authority exists "when the statements or conduct of the alleged principal reasonably cause the third party to believe that the principal consents to have the act done on his behalf by the purported agent."[52] Thus, apparent authority is created when a principal's actions make it reasonable for a third party to

---

[52] *Dunn v. Venture Bldg. Group, Inc.*, 283 Ga. App. 500, 503 (2007) (citations omitted).

believe the agent has authority to bind the principal.[53] Reasonable reliance is reliance justifiably exercised by a third party of "ordinary prudence conversant with business usages and the nature of the particular business."[54] Apparent authority must be based on the principal's conduct, not the agent's conduct.[55]

Absolutely no evidence exists from which a jury could find Legacy engaged in any conduct to cause Plaintiff to reasonably believe Sneed had Legacy's authority to induce or allow Plaintiff to dismantle the shelves. Plaintiff had no contact with Legacy whatsoever. Plaintiff simply testified he thought Sneed had Legacy's authority to be on the premises. However, apparent authority does not depend on what a "third party chooses to think an agent has the right to do, or even upon what the agent says he can do, but must be based on acts of the principal which have led the third party to believe reasonably the agent had such authority."[56] No evidence supports such a finding in this case.

Agency by Ratification

Finally, no agency relationship by ratification existed between Sneed and Legacy. "An agency relationship can . . . be created by ratification, when a principal subsequently ratifies the acts of another in his behalf. For ratification to be effective, the principal must know of the agent's unauthorized act and, with full knowledge of all the material facts,

---

[53] *Addley et al. v. Beizer,* 205 Ga. App 714, 718 (1992).
[54] *Id.* at 717 (citation omitted).
[55] *Id.*
[56] *Dunn,* 283 Ga. App. at 503.

accept and retain the benefits of the unauthorized act."[57] "A ratification by the principal

shall relate back to the act ratified and shall take effect as if originally authorized."[58] Here,

Plaintiff has failed to show any evidence Legacy knew Sneed recruited Plaintiff or even

that Plaintiff worked on the shelving. "[R]atification necessarily implies complete

knowledge of all the material facts relating to the transaction."[59]

<u>Scope of Authority</u>

Even if this Court assumes a reasonable jury could find an agency relationship

existed between Sneed and Legacy, the evidence unequivocally establishes Sneed acted

outside the scope of his authority in allegedly inducing and allowing Plaintiff to dismantle

the shelves. It is axiomatic that a principal is liable for the torts of his agent if committed

within the scope of the principal's business. "Every person shall be liable for torts

committed by his wife, his child, or his servant by his command or in the prosecution and

within the scope of his business, whether the same are committed by negligence or

voluntarily."[60] However, where an agent acts for his own personal benefit, his negligence

will not be imputed to his principal.[61]

---

[57] *J'Carpc, LLC v. Wilkins*, 545 F. Supp. 2d 1330, 1337 (N.D. Ga. 2008).
[58] O.C.G.A. § 10-6-52.
[59] *Hyer v. Citizens & S. Nat. Bank in Macon*, 188 Ga. App. 452, 453 (1988).
[60] O.C.G.A. § 51-2-2.
[61] *See, e.g., Hobbs v. Principal Fin. Group, Inc.*, 497 Ga. App. 243, 245 (1998) ("In determining the liability of the master for the negligent or willful acts of a servant, the test of liability is, not whether the act was done during the existence of the employment, but whether it was done within the scope of the actual transaction of the master's business for accomplishing the ends of his employment. If a servant steps aside from his master's business to do an act entirely disconnected

Here, even assuming a reasonable jury could find Sneed acted as Legacy's agent in allowing Plaintiff to dismantle the shelves, Sneed's actions were plainly for his own benefit. Legacy did not authorize Sneed to hire, retain, induce, or permit anyone other than a Legacy employee to help him dismantle the shelves. Sneed asked Hodgson, "when do you think I can bring someone in to help me tear down racks, build walls and other miscellaneous stuff that need to be done[?]."[62] To which, Hodgson replied, "[w]e can give you a [L]egacy employee any time you need one. Ask [M]ick or [F]rank."[63] Not only did Legacy not authorize Sneed to bring in anyone other than a Legacy employee to help dismantle the shelves, no one at Legacy knew Sneed was dismantling the shelves the day Plaintiff was injured.[64] Thus, even if Sneed was acting as Legacy's agent, he plainly acted outside the scope of his authority in inducing Plaintiff to help take down shelves, and thus Legacy cannot be held vicariously liable for any of Sneed's alleged negligence.

Plaintiff's Legal Status

Because no evidence shows Plaintiff, Johnson, and Sneed were on the property to conduct business with Legacy, but rather were there for Sneed's convenience, Plaintiff

---

from it, and injury to another results from a doing of the act, the servant may be liable, but the master is not liable.").

[62] Hodgson Depo., Ex. 7 [Doc. 28-2].

[63] *Id.*

[64] Sneed Depo., p. 60 [Doc. 28-3]. Sneed testified that although the Legacy CEO was in a different building about a half of a mile from the warehouse where Plaintiff was injured, "nobody [at Legacy] knew we was at that plant.".

may be considered, at most, a licensee on Legacy's premises.[65] Indeed Plaintiff's status as a licensee is supported by the fact no evidence supports any finding Legacy knew or reasonably should have known that Plaintiff and Johnson were on its property at all.[66] The purpose of Plaintiff's visit was merely to help Sneed. Plaintiff admits, "Why did I do it [dismantle the shelves]? I mean, a friend had asked me to do it. It was in hopes of getting a job in the future maybe."[67]

"The duty an owner owes to a licensee arises after the owner becomes aware of or should anticipate the presence of the licensee near the peril."[68] Here, the evidence is undisputed Legacy had no knowledge of Plaintiff's presence on its property. Moreover, no evidence supports a finding Legacy should have reasonably anticipated Plaintiff's presence on its premises. On the contrary, evidence shows Hodgson told Sneed to ask for a Legacy employee to help him take down the shelves. Although the evidence reasonably supports a finding Legacy should have reasonably anticipated Sneed's presence in its warhouse, no evidence supports a finding Legacy should have anticipated Plaintiff's presence. Sneed did not inform Legacy he intended to invite Plaintiff or any other person,

---

[65] *See Jones v. Barrow*, 304 Ga. App. 337, 339 (2010).

[66] *Id.*; *Jarrell v. JDC & Assoc., LLC*, 296 Ga. App. 523, 525 (2009) ("In the instant case, [plaintiff] may be considered, at best, a licensee as there was no evidence that the property owner even knew that he was on the property."); *Matlack v. Cobb Elec. Membership Corp.*, 289 Ga. App. 632, 634 (2008) ("Here, [the plaintiff] may be considered, at best, a licensee, as there is no suggestion that either [the occupier or owner] knew [the plaintiff] was on the property, much less that either benefitted from his presence.").

[67] Pl. Depo., p. 76 [Doc. 28-5].

[68] *Bartlett v. Maffett*, 247 Ga. App. 749, 750 (2001) (citation omitted).

and Legacy did not give Sneed permission to bring other persons to the property. Moreover, it is undisputed Plaintiff had no present business relationship with Legacy. The record is clear the only person Legacy reasonably should have been aware of in its warehouse was Sneed.  Thus, Plaintiff was at most a licensee.

<u>Legacy's Duty</u>

An owner's "duty to a licensee is not to injure the licensee wantonly or willfully."[69] "Wanton conduct has been described as that which is so reckless or so charged with indifference to the consequences as to be the equivalent in spirit to the actual intent to do harm or inflict injury."[70] Intent to injure is not an essential element of showing willful or wanton conduct.[71] "[W]illful or wanton conduct may also be shown where a landowner or occupier fails to exercise ordinary care to prevent injuring a person who is actually known to be, or may reasonably be expected to be, within the range of a dangerous act being done or a hidden peril on one's premises."[72]

Here, there is not a scintilla of evidence Legacy acted willfully or wantonly to injure Plaintiff or anyone else. Legacy did not know Sneed, Johnson, and Plaintiff were on its premises dismantling the shelves. Legacy did not authorize Sneed to enlist a non-Legacy employee like Plaintiff to help him dismantle the shelves. Legacy had no knowledge of the

[69] *Jarrell*, 296 Ga. App. at 523.
[70] *Trulove v. Jones*, 271 Ga. App. 681 (2005).
[71] *Ellis v. Hadnott*, 282 Ga. App. 584, 585 (2006).
[72] *Matlack v. Cobb Elec. Membership Corp.*, 289 Ga. App. 632, 634 (2008) (internal quotation marks and citation omitted).

ladder's existence. Moreover, no evidence indicates Legacy failed to exercise ordinary care to prevent injury to Plaintiff whom Legacy knew was "within the range of a dangerous activity on its premises."[73] Nor could any reasonable jury determine Legacy reasonably expected Plaintiff to be in its warehouse dismantling shelves. "The mere ownership of land or buildings does not render one liable for injuries sustained by persons who have entered thereon or therein; the owner is not an insurer of such persons, even when he has invited them to enter. Nor is there any presumption of negligence on the part of an owner or occupier merely upon a showing that an injury has been sustained by one rightfully on the premises."[74]

Sneed's Breach of Duty

Finally, even if the evidence here supported a finding that Sneed invited Plaintiff to Legacy's premises within his scope of authority as Legacy's agent, and thus Plaintiff was an invitee on Legacy's premises, no evidence supports a finding Sneed breached any duty owed to Plaintiff. Plaintiff argues Sneed breached his duty to warn Plaintiff of the danger that the vertical slats may fall and knock the ladder over. However, no evidence shows Sneed had superior knowledge of such danger or that any such danger was foreseeable. "The true ground of premises liability is a landowner's superior knowledge of [a] perilous condition and the danger therefrom to persons coming upon the property; it is when the

---

[73] *Id.*

[74] *Speaks v. Rouse Co. of Georgia*, 172 Ga. App. 9, 11 (1984).

perilous condition is known to the owner and not known to the person injured that a recovery is permitted."[75] "In order for [Legacy] to prevail on summary judgment, [it] ha[s] the burden to negate the existence of superior knowledge on [its] part, with all doubts and conflicts being resolved in plaintiff's favor."[76] Legacy meets this burden.

Plaintiff argues Sneed had superior knowledge that the vertical slats would fall, and he should have known a falling vertical slat would topple the ladder Plaintiff was using. In support of his argument, Plaintiff points to testimony in which Sneed admits the vertical slats of the shelving would fall over when the horizontal slats were removed, and once the horizontal slats were removed, he used the forklift to support the vertical slats.[77] However, Plaintiff had equal knowledge that the vertical slats would fall. Before his fall, Plaintiff had dismantled two or three sections of the shelving and noticed that "once you took the [horizontal] shelving down, you could push them over and [the vertical slats] would fall over."[78] Moreover, no evidence shows Sneed could have foreseen a falling vertical slat would topple the ladder. The fact Sneed used the forklift to support the vertical slats does not indicate he should have known the ladder could not support the vertical slats. The record contains no evidence showing Sneed had any more knowledge regarding the force of a falling vertical slat than Plaintiff did. Indeed, Plaintiff had

---

[75] *Glenn v. Gibbs,* 323 Ga. App. 18, 25 (2013) (internal quotation marks and citation omitted).
[76] *Id.* (internal quotation marks and citation omitted).
[77] Sneed Depo., pp. 46, 52 [Doc. 28-3].
[78] *Id.* at p. 87.

successfully used the ladder to dismantle two or three sections before the fall. It is undisputed Sneed did not know the ladder was in the warehouse, had never used the ladder in the past, and did not direct Plaintiff to use the ladder. Thus, no evidence supports a finding that Sneed had superior knowledge of the dangers to Plaintiff associated with dismantling the shelves or should have foreseen that a falling vertical slat would topple the industrial ladder Plaintiff stood upon.

## CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment [Doc. 28] is hereby **GRANTED**.

**SO ORDERED**, this 30th day of March, 2018.

S/ C. Ashley Royal
C. ASHLEY ROYAL, SENIOR JUDGE
UNITED STATES DISTRICT COURT